# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GAME TRACKER, INC., | ) | |
| | ) | |
| DEBTOR | ) | CIVIL NO. 10-189-P-H |
| _____ | | |
| ERNEST EDWARDS AND | ) | |
| KARLA EDWARDS, | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EASTMAN OUTDOORS, INC., | ) | |
| ROBERT EASTMAN, II, | ) | |
| ROBERT EASTMAN, III AND | ) | |
| ERIK EASTMAN, | ) | |
| | ) | |
| DEFENDANTS | ) | |

## DECISION AND ORDER ON MOTION TO SET ASIDE DEFAULT

This motion presents two major issues: whether service of process was proper upon a corporation that, at the time of service, was dissolved; and if so, whether good cause exists to set aside a default entered against it. I conclude that service of process met Maine law standards, and that the corporation has failed to establish that there is "good cause" to set aside the default.

### FACTS AND PROCEDURAL HISTORY

Ernest Edwards claims that he was injured on October 11, 2002, while using a defective elevated hunting stand sold by Game Tracker, Inc. Ernest Edwards and his wife, Karla Edwards, initiated a lawsuit against Game Tracker

and others in this court in July 2004.  They served Michael Stone, Esq. at the former corporate offices of Game Tracker in Michigan on July 20, 2004.  Summons in Ernest and Karla Edwards v. Game Tracker and Wal-Mart Stores East LP (Docket Item 6) in No. 2:04cv145.  After Game Tracker filed no answer, the Edwardses requested entry of default and default judgment against it.  The Clerk entered default on August 20, 2004.  Order Granting Mot. for Default (Docket Item 8) in No. 2:04cv145.  On October 15, 2004, Game Tracker filed for bankruptcy protection in the Eastern District of Michigan.  Thereafter, the case was stayed in this court because of those bankruptcy proceedings.  Order Granting Mot. to Stay (Docket Item 23) in No. 2:04cv145.  Approximately six months later, the Bankruptcy Court lifted the automatic stay to permit the Edwardses to pursue a reach and apply action against Game Tracker's insurers.  Bankruptcy Court Order (Docket Item 36-7) in No. 2:04cv145 (The Bankruptcy Court's Order vacating the automatic stay permitted the Edwardses to pursue their claims against Game Tracker, but only if recovery were limited to insurance proceeds.).  After a damages hearing in November 2006, the Magistrate Judge made recommended findings of fact and conclusions of law recommending damages of $1,964,931.23 in favor of the Edwardses.  Recommended Findings of Fact and Conclusions of Law (Docket Item 46) in No. 2:04cv145.  I adopted the Report and Recommended Decision and ordered that Default Judgment be entered accordingly.  Order Adopting Report and Recommended Dec. and Default J. (Docket Items 49 and 50) in No. 2:04cv145.  But ultimately the Edwardses were unable to recover on their

reach and apply claim against the insurers.[1]  See Edwards v. Lexington Ins. Co., 507 F.3d 35 (1st Cir. 2007).

In October 2002, at the time of Ernest Edwards' injuries, Game Tracker was an ongoing business, formed under the laws of Michigan, selling elevated hunting products, archery products and camping equipment.  Aff. of Michael Stone ¶ 3 (Docket No. 30-4).  Game Tracker ceased doing business on June 23, 2003.  Id.  After June 23, 2003, Game Tracker, Inc. had no place of business, and no employees.  Aff. of Robert Eastman ¶ 3 (Docket Item 41-1).  Game Tracker filed its Certificate of Dissolution on June 24, 2003.  Stone Aff. ¶ 3. Upon filing dissolution, Game Tracker ceased all operations.[2]  Id.

From August 2002 through June 23, 2003, Michael Stone Esq. served as corporate counsel for Game Tracker.  Id. ¶ 2; Eastman Aff. ¶ 4 ("[Michael Stone] was no longer employed by Game Tracker as of June 23, 2003.").  Although he was never an officer, director, or registered agent for Game Tracker and was never in charge of any office for Game Tracker, Stone was present at the former business location of Game Tracker on July 20, 2004, when an individual served the Edwardses' summons and complaint upon him and he acknowledged receipt of the summons and complaint.[3]  Stone Aff. ¶ 11. Thereafter, Stone states, while "winding up the dissolved company" he "began an open and continuous discourse advising [the Edwardses' Maine lawyer

---

[1] There is no contention that the *damages* judgment is binding upon Game Tracker or the adversarial defendants.

[2] Robert Eastman, a former shareholder and officer of Game Tracker, served as resident agent for the company at the time of its dissolution, and thereafter.  Aff. of Robert Eastman ¶ 2.

[3] Eastman states that "Mr. Stone was not authorized to receive service for Game Tracker, Inc. in 2004, and was not employed by the company in 2004."  Eastman Aff. ¶ 4.

Verne Paradie] of the lack of insurance coverage and limited, if not, insufficient funding remaining for the defense and payment of the existing product liability claims."[4]  Supplemental Stone Aff. ¶ 5; Stone Aff. ¶ 5.

Aware of the Edwardses' and other product liability lawsuits, "the former shareholders of Game Tracker determined that the prudent course of action was to file bankruptcy, placing the remaining monies into bankruptcy to allow the individual litigants to seek recovery from the remaining assets."  Stone Aff. ¶ 12.  Stone was asked to renew his role as counsel and assist with the preparation of the necessary materials for filing bankruptcy.  Id. ¶ 13; Supplemental Stone Aff. ¶ 2.  Sometime thereafter Stone advised the Edwardses' counsel that Game Tracker would be filing bankruptcy.  Stone Aff. ¶ 13.  Ultimately, the Edwardses filed their claim against the bankruptcy estate.

In October 2006, the trustee in bankruptcy initiated an adversarial action (it included the Edwardses' and other product liability claims) against Eastman Outdoors, Inc., Robert Eastman II, Robert Eastman III and Erik Eastman.  Second Am. Compl. (Docket Item 174) in No. 06-03242 (E.D. Mich.

---

[4] Attorney Paradie has a slightly different take on the events.  Between August 20, 2004 and October 15, 2004, Paradie states that he had several conversations with Stone who, Paradie says, represented that he was in-house counsel for Game Tracker.  Aff. of Verne Paradie ¶ 3 (Docket Item 40-4).  Through his conversations with Stone, Paradie understood that Stone was continuing to "wrap up" some unfinished business on behalf of Game Tracker, including resolving some pending product liability matters in various jurisdictions across the United States.  Id.  During these conversations, Paradie states that Stone specifically indicated that he did not plan on filing for bankruptcy protection on behalf of Game Tracker and that his only interests at the time were to finish up the lingering matters against Game Tracker and to "protect" the Game Tracker shareholders.  Id. ¶ 5.  At some point after the entry of default, Stone indicated to Paradie that he had changed his mind and had decided to file for bankruptcy protection for Game Tracker.  Id. ¶ 6. Paradie states that "[a]ttorney Stone always represented that he was Game Tracker's attorney and never once indicated that he was not authorized to accept service of the complaint on its behalf."  Id. ¶ 7.

Bank.). The individual Eastmans were the pre-dissolution owners of Game Tracker and are now the owners of Eastman Outdoors. The Eastmans and Eastman Outdoors entered into a settlement agreement and later an amended settlement agreement with the trustee, by which they agreed to pay successful product liability claims, subject to a total damages cap of $500,000. Settlement Agreement ¶ 4 (Docket Item 30-9). The bankruptcy court approved the settlement agreement. Order Granting Trustee's Mot. for Order Approving Amended Settlement Agreement (Docket Item 285) in No. 06-03242 (E.D. Mich. Bank.). The bankruptcy court then recommended withdrawal of the reference as to the Edwardses' claims. See Sua Sponte Recommendation to the District Court to Withdraw the Reference Regarding Objection to Claim No. 13 of Earnest and Karla Edwards (Docket Item 2). Thereafter, the District Court for the Eastern District of Michigan found that venue was proper in the District of Maine and transferred the matter here. Opinion and Order Setting Venue (Docket Item 16). It was opened here as a new case, and the adversarial defendants and Game Tracker (collectively "Game Tracker") now seek to set aside default in the 2004 lawsuit. Motion to Set Aside (Docket Item 30).

### ANALYSIS

Game Tracker asserts that the default must be lifted because it is contrary to the settlement agreement entered into between Game Tracker and the bankruptcy trustee; because service of process preceding the default was improper; and because there is otherwise good cause to set aside the default.

## I. Settlement Agreement

With respect to the bankruptcy settlement agreement, Game Tracker argues that it retained its rights to "fully litigate liability in this proceeding by 'preserv[ing] and retain[ing] any and all defenses to the Product Claims' and by disclaiming all 'liability for such claims.'" Mot. to Set Aside Default at 8. What the settlement agreement says is that the Game Tracker defendants "shall assume full rights and responsibilities for all product liability claims" of the Edwardses and others, but that they "preserve and retain any and all defenses to the Product Claims and by entering into this Settlement Agreement do not acknowledge that the bankruptcy estate or any of the Defendants have any liability for such claims." Settlement Agreement ¶¶ 3, 5. That language does not resurrect any rights previously forfeited by the 2004 entry of default in the lawsuit in this court. Any basis for setting aside that default must come from Rule 55(c). Fed. R. Civ. P. 55(c).

## II. Setting Aside the Default

Rule 55(c) allows for default to be set aside upon a showing of "good cause." Fed. R. Civ. P. 55(c); see also Franco v. Selective Ins. Co., 184 F.3d 4, 8 (1st Cir. 1999); Coon v. Grenier, 867 F.2d 73, 76 (1st Cir. 1989).

### A. Service of Process

Due process requires proper service for a court to have jurisdiction to adjudicate the parties' rights. O.J. Distributing, Inc. v. Hornell Brewing Co., Inc., 340 F.3d 345, 353 (6th Cir. 2003). If service of process on Game Tracker was improper, the court must set aside the default. Id.; see also Omni Capital

Int'l, Ltd. v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."); Mason v. Genisco Tech. Corp., 960 F.2d 849, 851 (9th Cir. 1992) (default judgment is void where a plaintiff fails to serve process properly); Bank One of Cleveland, N.A. v. Abbe, 916 F.2d 1067 (6th Cir. 1990); Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc., 840 F.2d 685, 688 (9th Cir. 1988) ("A federal court does not have jurisdiction over a defendant unless the defendant has been served properly[.]").

It is the Edwardses' burden to establish proper service on Game Tracker in 2004. Rivera-Lopez v. Municipality of Dorado, 979 F.2d 885, 887 (1st Cir. 1992); Saez Rivera v. Nissan Mfg. Co., 788 F.2d 819, 821 n. 2 (1st Cir. 1986). Federal Rule of Civil Procedure 4(h) governs service upon corporations. The version in effect in 2004 stated:

> Unless otherwise provided by federal law, service upon a domestic or foreign corporation ... shall be effected: ... in a judicial district of the United States in the manner prescribed for individuals by subdivision (e)(1), or by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.

Fed. R. Civ. P. 4(h) (2004).[5] The Edwardses maintain that they made proper service by delivering the complaint and summons to Stone because he was either a managing or a general agent by virtue of his role as corporate counsel.

---

[5] The language of current Rule 4(h) is slightly different, but inconsequential to the issue I decide.

Creditors' Response and Objection to Debtor and Adversarial Defs.' Mot. to Set Aside Default at 13 (Docket Item 40). Alternatively, the Edwardses contend that they made proper service under subdivision (e)(1), which at the time allowed service "pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State."[6] Fed. R. Civ. P. 4(e)(1) (2004). The Edwardses assert that in 2004 Maine Rule 4(d)(9) permitted leaving copies of the summons and complaint at Game Tracker's place of business in Michigan or, alternatively, that Maine law considered their service of process effective because Game Tracker received actual notice of the suit. Creditors' Response and Objection to Debtor and Adversarial Defs.' Mot. to Set Aside Default at 15.

### 1. Service of Process Under Federal Rule 4(h)

There is no evidence that Stone was expressly empowered to accept service of process on behalf of Game Tracker or that as corporate counsel he was a "managing or general agent."[7] Stone and Eastman explicitly deny such

---

[6] I have quoted the 2004 version of Rule 4(e)(1). There have been stylistic changes in the interim.

[7] The Edwardses do not argue that Stone can satisfy either the "managing or general agent" requirement other than through his role as attorney. The record is clear that at the time of service, Stone was not employed by Game Tracker. To be an agent of a corporation, partnership, or other unincorporated association within the meaning of Rule 4(h), an individual ordinarily must be in the current employ of the organization upon which service of the summons and complaint is to be made. Westcott-Alexander, Inc. v. Dailey, 264 F.2d 853 (4th Cir. 1959) (Service of process on a foreign corporation could not be made by delivering it to the corporation's former agent after he had ceased to represent the corporation, although the cause of action arose out of his activity while representing the corporation.); Herpst v. S.B.I. Liquidating Corp., 279 F. Supp. 928 (D. Pa. 1968) (Service of process upon a company that had ceased to act as the defendant corporation's agent more than seven months before the complaint was filed was not valid.); Granite Chem. Corp. v. Northeast Coal & Dock Corp., 249 F. Supp. 597, 598 (D. Me. 1966) (service on husbanding agent for vessel for the specific port of
*(continued next page)*

authorization.  Stone Aff. ¶ 11; Eastman Aff. ¶ 4.  Although there is no First Circuit authority directly on point, the weight of the case law is against the Edwardses' argument.

"An attorney will not be deemed an appointee for service of a lawsuit on behalf of [his] client simply by virtue of [his] role as an attorney." <u>Thelen v. City of Elba</u>, Civil No. 08-1150, 2009 WL 212940 at *4 (D. Minn. Jan. 28, 2009) (citing <u>Indus. Indem. Co. v. Harms</u>, 28 F.3d 761, 762 (8th Cir. 1994)); <u>Maiz v. Virani</u>, 311 F.3d 334 (5th Cir. 2002) (service of process on party's attorney of record was not valid, absent showing that attorney had actual authority to accept service); <u>United States v. Ziegler Bolt & Parts Co.</u>, 111 F.3d 878, 881 (Fed. Cir. 1997) (mere relationship between defendant and his attorney does not, in itself, convey authority to accept service); <u>MW Ag v. New Hampshire Ins. Co.</u>, 107 F.3d 644, 647 (8th Cir. 1997) (under Michigan law the plaintiff failed to establish that service to the defendant's attorney was proper because there was no evidence that the attorney was an "agent authorized expressly or impliedly . . . to receive service of summons" merely because the attorney negotiated with the plaintiff on behalf of the defendant); <u>Santos v. State Farm Fire and Cas. Co.</u>, 902 F.2d 1092, 1094 (2d Cir. 1990); <u>Dandrea v. Malsbary Mfg. Co.</u>, 839 F.2d 163 (3d Cir. 1988) ("Service upon an attorney under former Rule 4(d)(3) is not effective unless the attorney had either express or implied

call in Maine was insufficient to bind foreign corporation shipowner which had no agency relationship with husbanding agent at time of service); <u>Grummitt v. Sturgeon Bay Winter Sports Club</u>, 197 F. Supp. 455 (D. Wis. 1961) (The plaintiff suing a nonstock corporation did not establish a present agency by showing that a former officer of the corporation had signed his response on behalf of the corporation or by an earlier agreement signed by him as an officer.).

authority to receive service on his client's behalf."); <u>Mandale v. Des Moines Tria</u>

<u>Tower</u>, LLC, Civil No 08-04888, 2009 WL 2412596, *2-3 (E.D. Pa. Aug. 5, 2009)

("attorney-client relationship between [attorney who received service] and

[defendants], and [attorney's] act of accepting service" does not "suffice[] as

evidence of authority to accept service") (citing <u>Ziegler Bolt and Parts Co.</u>, 111

F.3d at 881)); 4A C. Wright & A. Miller, Federal Practice and Procedure: Civil 3d

§ 1097 ("Thus . . . even the defendant's attorney probably will not be deemed

an agent appointed to receive process absent a factual basis for believing that

an appointment of that type has taken place.").

Nevertheless, in the absence of an express appointment to accept service,

authorization sometimes can be *implied* from the type of relationship or the

conduct in question.  <u>See</u> <u>In re Focus Media Inc.</u>, 387 F.3d 1077, 1082 (9th Cir.

2004) (finding implied authority to accept service); <u>Ziegler Bolt & Parts Co.</u>, 111

F.3d at 881 ("An agent's authority to accept service may be implied in fact.");

4A C. Wright & A. Miller, Federal Practice and Procedure: Civil 3d § 1097

("[A]lthough authority to accept process need not be explicit, it must either be

express or implied from the type of relationship that has been established

between the defendant and the alleged agent."); <u>Reckling v. Okechuhu</u>, Civil

No. 07-1699(GEB), 2007 WL 2473831, at *5 (D. N.J. Aug. 27, 2007) (a court

can infer an attorney's "[i]mplied authority . . . from the particular conduct in

question[ ] and from the particular circumstances in the case").  There is some

evidence in this record that after August 20, 2004, Stone had implied authority

to "wind[ ] up" the outstanding liability lawsuits.  Supp. Stone Aff. ¶ 5.  But the

Edwardses made service on Stone before then, on July 20, 2004. Although, curiously, Stone was at Game Tracker's former corporate offices on that day, the record does not reveal what his role was at that time or support a finding that he then possessed any implied authority to accept service on behalf of Game Tracker. Instead, the record is undisputed that in July 2004 Game Tracker was a dissolved corporation and that Stone was no longer employed by Game Tracker. Eastman Aff. ¶¶ 3, 4. Moreover, Stone never served as an officer, director, or registered agent for Game Tracker and was never in charge of any office for Game Tracker. Id. ¶ 2. The authority to accept service cannot come from mere "broad powers to represent a client in litigation, . . . [i]nstead, the record must show that the attorney exercised authority beyond the attorney-client relationship, including the power to accept service." Ziegler Bolt and Parts Co., 111 F.3d at 881. To that end, "[o]bviously, something more than mere acceptance must be shown to demonstrate an agency relationship for this specific purpose" of accepting service. United States v. Marple Cmty. Record, Inc., 335 F. Supp. 95, 102 (D. Pa. 1971); see also Ziegler Bolt and Parts Co., 111 F.3d at 882; In re Focus Media Inc., 387 F.3d at 1082-83 (in some instances counsel may have implied authority to accept service of process; factors to consider are whether agent's activities involve independent judgment and discretion, and whether attorney has acted on behalf of client in another proceeding (citing Ziegler Bolt and Parts Co., 111 F.3d at 881)).

Without evidence of either express or implied authority, the Edwardses' reliance on the attorney-client relationship between Stone and Game Tracker

and on Stone's act of accepting service are insufficient to support any type of authority to accept service under Rule 4(h).  See Ziegler Bolt and Parts Co., 111 F.3d at 881; Marple Cmty. Record, 335 F. Supp. at 102.

### 2.  Service of Process Under Rule 4(e)(1)–Michigan and Maine Law

Rule 4(h) permits service in accordance with Rule 4(e)(1).  Service is proper under Rule 4(e)(1) if it complies with the law of either Michigan (where service was made) or Maine (where the district court for the 2004 lawsuit is located).  Fed. R. Civ. P. 4(e)(1).

### a.  Michigan

The Edwardses served the summons and complaint on Stone in Michigan.  The Edwardses do not make any argument that their service was technically proper under Michigan law and I see no basis for finding it so.[8]

---

[8] The Edwardses' method of service did not meet the standards of any of the Michigan alternatives.  Under Michigan law, a dissolved corporation may be sued in its corporate name and process may issue against the corporation in the same manner as if dissolution had not occurred by:

> (1) leaving a summons and a copy of the complaint with any officer or the resident agent, or
>
> (2) leaving a summons and a copy of the complaint with any director, trustee, or person in charge of any office or business establishment and sending a summons and a copy of the complaint by registered mail, addressed to the principal office of the corporation, or
>
> (3) leaving a summons and a copy of the complaint with any of the persons who may have been the last presiding officer, president, cashier, secretary, or treasurer, in the case of any corporation which may have ceased to do business by failing to keep up its organization by the appointment of officers or otherwise, or whose term of existence may have expired by limitation, or
>
> (4)  mailing a summons and a copy of the complaint by registered mail to the corporation or an appropriate corporation officer and to the Michigan corporation and securities commission if:
>
> (a) the corporation has failed to appoint and maintain a resident agent or to file a certificate of such appointment as by law required; or

*(continued next page)*

### b.  Maine

### i.  The Rule

The Maine Rules of Civil Procedure provide for service upon a corporation established under the laws of any other state:

> (a) by delivering a copy of the summons and of the complaint to any officer, director or agent, or by leaving such copies at an office or place of business of the corporation within the state; or (b) by delivering a copy of the summons and of the complaint to any agent or attorney in fact authorized by appointment or by statute to receive or accept service on behalf of the corporation, provided that any further notice required by statute shall also be given.

Me. R. Civ. P. 4(d)(9).[9]  The Edwardses contend that they satisfied Maine Rule 4(d)(9) because they left copies of the summons and complaint at the office or place of business of the corporation.  Although it is curious that Stone was at Game Tracker's former corporate office on the day that service was attempted, there is no evidence in the record to support a finding that any Game Tracker business was being conducted out of that office any longer.  To the contrary, the record is clear that Game Tracker had been dissolved in 2003 and had no place of business in July 2004.  Edwards Aff. ¶ 3.  Therefore, the Edwardses did not comply with Rule 4(d)(9).

---

> (b) the corporation has failed to keep up its organization by the appointment of officers or otherwise, or the term of whose existence has expired by limitation.

Mich. Comp. Laws § 600.1920; <u>see also</u> Mich. Comp. Laws § 450.1834.  The language of the Michigan corporate service statute is the same today as it was in 2004.
[9] The language of Maine Rule 4(h) is the same today as it was in 2004.

### ii. *Maine Case Law*

Finally, the Edwardses assert that even if they did not satisfy the Maine Rule's formalities, Maine law overlooks "technical noncompliance" with the rules of service when the defendant had actual notice of the proceedings. <u>See</u> <u>Gaeth v. Deacon</u>, 964 A.2d 621, 627 (Me. 2009) ("the ultimate question when due process and the adequacy of notice of suit are at issue is whether the notice or attempted notice was reasonably calculated to give a defendant notice of the pendency of the action, not whether the technical requirements of a rule governing service of process were met"); <u>Maguire Constr. Inc. v. Forster</u>, 905 A.2d 813 (Me. 2006)(because actual notice is the ultimate goal of any form of service, technical deficiency in service of process does not mandate dismissal when defendant had actual and timely notice); <u>Phillips v. Johnson</u>, 834 A.2d 938, 945 (Me. 2003); <u>People's Heritage Savings Bank v. Pease</u>, 797 A.2d 1270, 1274-75 (Me. 2002) (entering a default judgment against a defendant that had actual notice of an action despite a technical noncompliance with the rules of service may be appropriate) (citing 1  R. Field, V. McKusick & K. Wroth, Maine Civil Practice, § 4.5 at 69 (2d ed. 1970)).  There is evidence in the record that Game Tracker did receive notice of the Edwardses' lawsuit.  Stone Aff. ¶ 12. Indeed, it was the Edwardses' lawsuit along with others that led Game Tracker to file for bankruptcy.  <u>Id</u>.  ("Although service was improper, . . . remaining funds at the time were insufficient to actively defend this lawsuit. . . . Thus, the former shareholders of Game Tracker determined that the prudent course of action was to file bankruptcy, placing the remaining monies into bankruptcy to

allow the individual litigants to seek recovery from the remaining assets."). The default was entered on August 20, 2004 and the parties were negotiating resolution of the claims until Game Tracker filed for bankruptcy on October 15, 2004. Although Stone was not formally employed by Game Tracker, he was engaged in the "winding up the dissolved corporation," Supplemental Stone Aff. ¶ 5, negotiating outstanding claims against Game Tracker and later the preparation and filing of the bankruptcy petition. Stone Aff. ¶¶ 5, 13. Game Tracker does not contend that it did not have actual notice of the Edwardses' action. Despite knowledge of the lawsuit, Game Tracker never answered the Edwardses' complaint. Thus, there is no dispute that service on Stone had the intended effect: Game Tracker learned that the Edwardses had filed a lawsuit against it. Under Maine law, although technically defective, the service to Stone provided sufficient notice of the Edwardses' lawsuit to Game Tracker to be effective service.

### B. Good Cause Factors

Because service of process was proper on Game Tracker, I now consider whether to set aside Game Tracker's default under the good cause factors. The phrase "good cause" is liberally construed. Venegas-Hernandez v. Sonolux Records, 370 F.3d 183, 187 (1st Cir. 2004); United States v. $23,000 in United States Currency, 356 F.3d 157, 164 (1st Cir. 2004). There is no mechanical formula for determining whether good cause exists and courts may consider a host of relevant factors. See Indigo America, Inc. v. Big Impressions, LLC, 597 F.3d 1, 3 (1st Cir. 2010). The factors typically considered include: (1) whether

the default was willful; (2) whether setting it aside would prejudice the adversary; (3) whether a meritorious defense is presented; (4) the nature of the defendant's explanation for the default; (5) the good faith of the parties; (6) the amount of money involved; and (7) the timing of the motion to set aside the entry of default. Id. (quoting KPS & Assocs. v. Designs by FMC, Inc., 318 F.3d 1, 12 (1st Cir. 2003)). The factors are not "talismanic," and the Court may consider others as well. CJC Holdings, Inc. v. Wright & Lato, Inc., 979 F.2d 60, 64 (5th Cir. 1992). Ultimately, the burden of demonstrating good cause is with the party seeking to set aside the default. Indigo America, 597 F.3d at 3.[10]

### 1. *Willfulness of Default*

The default occurred because Game Tracker failed to file an answer or file for bankruptcy before its Answer was due. Game Tracker asserts that its default was not willful because it relied on the assistance of its former counsel who performed the work on his own time without cost to the estate, Supplemental Stone Aff. ¶ 2, and it notified the Edwardses that Game Tracker was dissolved and that it would be filing for bankruptcy in the near future. The default, Game Tracker contends, was a result of the Edwardses' decision to "rush to the courthouse with knowledge of both the dissolution and the upcoming bankruptcy." Mot. to Set Aside Default at 16.

---

[10] The adversary defendants also contend that good cause exists to set aside the default "because the default was not entered against the defendants against whom it is being used." Mot. to Set Aside Default at 11. I do not understand that argument. The default here was against Game Tracker. That is the only default I can consider. What effect it may have on the other adversarial defendants flows from actions they took in the bankruptcy court.

As discussed above, Game Tracker received notice of the Edwardses' lawsuit in July 2004 when Stone accepted service of process on behalf of Game Tracker. Game Tracker was aware of the Edwardses' lawsuit and "determined that the prudent course of action was to file bankruptcy." Stone Aff. ¶ 12. At that time, Stone was "asked to renew [his] role as counsel and assist with the preparation of the necessary materials for filing of bankruptcy." Id. ¶ 13. But despite its knowledge of the lawsuit, Game Tracker did not file bankruptcy papers until after it had been defaulted. That was willful on the part of Game Tracker, and the nature of Attorney Stone's engagement is really not material.[11] See Conetta v. National Hair Care Centers, Inc., 236 F.3d 67, 75 (1st Cir. 2001) (affirming district court's refusal to set aside default where defendant's president knew that amended complaint had been filed and chose for improper reasons not to defend the case). This factor weighs in favor of denying the motion.

---

[11] During the summer and fall of 2004, Stone was acting as the corporate representative in "winding up" the dissolved business and attempting to resolve outstanding product liability claims with the Edwardses and others. Supplemental Stone Aff. ¶ 5; Stone Aff. ¶ 5; Paradie Aff. ¶ 4. Stone's affidavit states that he "performed this work on my own time . . . at no cost to the estate." Supplemental Stone Aff. ¶ 2. Regardless of whether Game Tracker was paying Stone for his work, Game Tracker was aware of the lawsuit and should have taken action to avoid being defaulted. Stone's affidavit also includes detail regarding the reasons for his delay in filing pleadings on behalf of Game Tracker, and the Game Tracker defendants argue that "[d]ue to his commitment to the U.S. Military, General Stone could not prepare the pleadings before October 2004." Mot. to Set Aside Default at 15. Although it is understandable that being notified of recall to active duty in the United States Army and expecting deployment (apparently it did not actually occur) would cause disruption and necessitate significant planning in both professional and personal life, it does not excuse failure to file responsive pleadings in the Edwardses' lawsuit or to file the bankruptcy documents for almost three months after Game Tracker received notice of the Edwardses' suit. Even after default was entered against it, Game Tracker did nothing to set it aside. Game Tracker chose its lawyer and is responsible for its lawyer's actions or inactions.

## 2. *Prejudice*

Game Tracker contends that "[s]etting aside the default would not prejudice the Edwards[es] as it would merely place them back into the same position they would have been in at the onset of the case."[12]  Mot. to Set Aside Default at 19.  The Edwardses respond that they will be prejudiced if I set aside the default because their economic expert has retired and Mr. Edwards' surgeon has moved his practice out of state.

"Prejudice exists if circumstances have changed since entry of the default such that plaintiff[ ]s['] ability to litigate [their] claim[s] is now impaired in some material way or if relevant evidence has become lost or unavailable."  Accu-Weather, Inc. v. Reuters, Ltd., 779 F. Supp. 801, 802 (M.D. Pa. 1991); Emcasco Ins. Co. v. Sambrick, 834 F.2d 71, 73 (3d Cir. 1987).

Six years have passed since default was entered in the Edwardses' lawsuit.  If the lawsuit is re-opened, the Edwardses would need to hire a new damages expert and likely would have to find a new physician to testify on Mr. Edwards' medical condition.  This additional burden of finding new witnesses would result in prejudice to the Edwardses as a result of lifting the default. See Viera Aviles v. Suiza Dairy Corp., 206 F.R.D. 338, 341 (D. P.R. 2002) (court found relocation of treating physician after entry of default created prejudice to plaintiff).  This factor weighs in favor of denying the motion.

---

[12] Game Tracker also asserts that the Edwardses' claims of prejudice are misplaced because they were not the result of the default but rather would have occurred after the bankruptcy stay entered regardless of whether an answer was filed.  Reply on Mot. To Set Aside at 5 (Docket Item 41).  Game Tracker's backward-looking argument focuses on the wrong cause for prejudice. The issue is whether the Edwardses will now suffer prejudice if the court sets aside the default.

### 3. *Existence of a Meritorious Defense*

Game Tracker asserts that it has a meritorious defense to the Edwardses' lawsuit, namely, that its product is not defective. According to its expert, the Game Tracker Model 3010 safety belt is safe for its intended use and is not defective. Aff. of Lorne J. Smith ¶ 12 (Docket Item 30-10). The Edwardses do not dispute that for purposes of this motion, Game Tracker possesses a meritorious defense. This factor weighs in favor of setting aside the default.

### 4. *Defendant's Explanation for the Default*

Game Tracker does not explain why it did not file an Answer to the Edwardses' suit. It asserts generally that at the time the Edwardses filed their lawsuit the corporation was dissolved, had no insurance and lacked sufficient funds to hire counsel and defend the lawsuit. Mot. To Set Aside Default at 14-15. Nevertheless, during the time period that the Answer should have been filed, Stone was working to "wind[ ] up" the corporation, engaged in "open and continuous" discussions about the Edwardses' claims and, subsequently, prepared and filed for bankruptcy on behalf of Game Tracker. Supplemental Stone Aff. ¶ 5; Stone Aff. ¶¶ 5, 13. On this record, Game Tracker's inaction is inexplicable. This factor weighs against lifting the default.

### 5. *Amount of Money Involved*

The amount of the default judgment entered by this court was approximately $2,000,000. The bankruptcy settlement agreement between the trustee and Game Tracker caps the recovery of all product claimants (there appear to be two others, according to the settlement agreement) at $500,000. Settlement Agreement ¶ 4. Although the amount of the Edwardses' ultimate

recovery, therefore, cannot exceed one-quarter of the original default judgment, it could still be substantial. This factor weighs in favor of lifting the default.

### 6. *Timeliness of the Motion to Overturn Default*

It has been approximately six years since the entry of default. Game Tracker claims that "nearly the entire time this matter was subject to the automatic stay which prohibited any action in the district court, and thus should not be counted." Mot. to Set Aside Default at 20. But Game Tracker failed to request setting aside the default during the two months from its entry until the bankruptcy filing and during the five months after the adversary proceeding left the bankruptcy court.[13] The delay outside the automatic stay was excessive and thus weighs against Game Tracker. General Contracting & Trading Co., LLC v. Interpole, Inc., 899 F.2d 109, 112 (1st Cir. 1990) (upholding default where defendant waited three and a half months before moving to set it aside); Morgan v. Hatch, 118 F.R.D. 6, 9 (D. Me. 1987) (holding that six weeks constitutes excessive delay absent explanation); Reynolds v. Bar Harbor Whale Watch Co., Civil No. 00-102-B-H, 2001 WL 26205, at *4 (D. Me. Jan. 9, 2001) (finding the crucial fact for upholding default to be that defendant waited four months before moving to set it aside).

---

[13] The bankruptcy reference was withdrawn and the case was transferred to the district court on November 23, 2009. In asserting that there was a five month delay, the Edwardses presumably counted the time from January 8, 2010, the date Game Tracker and the adversarial defendants filed their initial appearances in the district court, to June 7, 2010, when Game Tracker filed its motion to set aside the default. This delay in filing the motion to lift the default accounts for five months.

### 7. *The Good Faith of the Parties*

I have already considered the willfulness of Game Tracker's actions and Game Tracker's delay in moving to set aside the default. I find it unnecessary to resolve one other Michigan law issue that the Edwardses raise as evidence of the Game Tracker defendants' bad faith.[14]

### CONCLUSION

Although the meritorious defense and the amount of money at stake favor Game Tracker, all the other factors weigh against setting aside the default. On this record, Game Tracker cannot meet its burden to set aside the default. I therefore **DENY** Game Tracker's Motion to Set Aside Default.

**SO ORDERED.**

**DATED THIS 27TH DAY OF OCTOBER, 2010**

/s/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[14] Michigan recently passed a law that alters the statute of limitations analysis for dissolved corporations. The Edwardses ask me to find that Game Tracker and the adversary defendants "utilized the delay in this matter to convince the Michigan Legislature to enact a law that only applied to the Edwards[es]' claims against Game Tracker, and that essentially retroactively destroys the Edwards[es]' claims." Response and Opp'n to Mot. To Set Aside Default at 17 (Docket Item 40). "During the same time, . . . Debtor and Adversary Defendants, reached a settlement with the Trustee that not only seriously limited the Edwards[es]' recovery, but they did so all the while knowing that the Legislature was going to enact a special statute of limitations/repose for them to prevent any recovery for the Edwards[es]." Id. The Edwardses assert that this is evidence of bad faith and that it is an additional argument of prejudice; Game Tracker asserts that the new statute gives them an additional argument of a meritorious defense. But because I have already found that Game Tracker has a meritorious defense under the good cause analysis, it adds nothing to Game Tracker's argument. And because I already find prejudice to the Edwardses in lifting the default, it adds nothing to their argument on prejudice. Therefore, I do not resolve the issue of whether the amendment to the statute of limitations would apply to this case if the default were lifted.